VIRGINIUS W. LAND v. THE WILMINGTON AND WELDON RAILROAD.

*Penalty—Common Carrier—"Regular Depot or Station."*

1. The terms "a regular depot," or "station," employed in section 1964 of *The Code*, contemplate fixed and established places on the line of a railroad, or other transportation company, equipped with suitable buildings and furnished with the necessary officers and servants for the regular transaction of business, for the receipt and delivery of freights, and the comfort and convenience of passengers.

2. Where it was shown that a railroad company had been in the habit of stopping at a certain locality to deliver mails; that it received such passengers there as might wish to embark on its trains, and that it had also been accustomed to receive and deliver freights for the accommodation of its patrons in the vicinity ; that the place was designated as a station on its tariff schedule, but that it had no agent, office, warehouse, or other facility for the transaction of its business : *Held*, not to constitute "a regular depot," or "station," within the meaning of the statute.

This is a CIVIL ACTION, which was tried before *MacRae, J.*, at March Term, 1889, of HALIFAX Superior Court.

The action is brought to recover divers penalties which, the plaintiff alleges, the defendant Railroad Company incurred by the refusal of its agent to receive certain car-loads of lumber at one of its regular stations on its road, called "Spring Hill," for transportation, &c., in violation of the statute. (*The Code*, § 1964).

On the trial, the Court, among numerous issues, submitted one in these words :

" 1. Was Spring Hill a regular depot of defendant on its branch road from Halifax to Scotland Neck, from the 29th of October to the 5th of November, 1888, inclusive ? "

The substance of the evidence produced on the trial, bearing upon this issue, was as follows :

The plaintiff introduced J. H. Darden, who testified, among other things : " When the train is running from Halifax to Scotland Neck, after leaving Tillery, it stops every day at Spring Hill ; on some occasions it stops at Tillery's Turnout, a mile this side of Spring Hill. On return from Scotland Neck it always stops at Spring Hill ; the announcement, 'Spring Hill !' is made on the train going and coming. It is now a 'prepay' station. Some time ago they had an agent there, and it was a regular station. Plaintiff has had a saw-mill at Spring Hill since May, 1887 ; defendant has been taking his lumber all to the train at Spring Hill

104—4

Turnout station.  They had an agent, J. F. Brinkley; none
that I am aware of since he left. Local Freight Tariff No. 2,
was pasted up in the depot at Spring Hill—that is, in the
railroad office, where the agenc was when Mr. Brinkley was
agent, where the railroad business was transacted. There are
a half-dozen in there now."

The plaintiff then introduced in evidence said Tariff
No. 2.

" On 30th October, 1888, I tendered two cars of lumber
for shipment to Taliaferro & Co., Richmond, to Captain Has-
sardshort, the conductor on the Scotland Neck branch of the
Wilmington and Weldon Railroad at Spring Hill—des-
tination, one to Richmond, one to Elba Station.  The cars
I .tendered were on side-track at Spring Hill, loaded and
ready for transportation.  Capt. Hassardshort didn't receive
them.  They had been in the habit of taking plaintiff's lum-
ber at Spring Hill, never anywhere else; been in the habit
of tendering it to the conductor.  The paper was in S. P.
Brinkley & Son's office, where they kept railroad office.   I
took it down to use here. Don't know, can't speak positively,
whether there has been a railroad office there for several
months past.  Mr. Brinkley was the agent there, and resigned;
don't know exact date.   I seldom travel over the railroad;
don't know that all the lumber shipped at Spring Hill is
billed from Tillery. The room where I got the paper I don't
suppose is the railroad office now; it was not in October,
1888; there was no agent there.  The old books are there
now, and notices are up on the wall now.   I took it down to
refresh your memory, and that of all persons interested.  It
is a prepay station now; it was a regular station sometime
ago.  When we were shipping from there—when Mr. Brink-
ley was there—we did not prepay, and did not afterwards.
When Mr. Brinkley was there, and it was a regular station,
and goods were shipped to a party, Brinkley collected freight
there; since then it is customary in ordering goods to pre-

pay freight. Don't know whether the freight charges are the same from Spring Hill as from Tillery; don't buy tickets at Spring Hill; no warehouse of company there, nothing but a platform, and I don't know that the defendant has any employee there to look after freight. No telegraph office. Bills of lading are given at Tillery and Scotland Neck. At Spring Hill, the bills of lading are given by conductor on train. Don't know that the lumber was shipped as from Tillery station; I always billed them as shipped at Spring Hill. Don't remember what freight I have shipped, and got bill of lading for, except cotton; don't know that they take up cotton at any cross-roads on railroad."

Defendant introduced A. S. Hassardshort, who testified, among other things, as follows: " Am conductor on Scotland Neck branch W. & W. R. R, Co., and was from 29th October to and including 5th November, 1888. No tickets were sold at Spring Hill; no agent, no warehouse nor telegraph office. I think Mr. Brinkley resigned in December, 1886, and there had been no agent there for about two years. I remember Darden offering me cars at the time of the block in Richmond. They give me bill there, and I take it to nearest station and have it billed by agent. It is billed, not at Spring Hill, but at Tillery. I believe that is the only way I ever received it at Spring Hill. The agent bills it at Tillery."

*Cross-examined.*—" Have book for train as to passengers. It is put down what I shall charge passengers to Spring Hill, 60 and 50 cents; to Scotland Neck, 75 and 60 cents; carry prepaid freight to Spring Hill. If not prepaid, carry it to Scotland Neck. We take cotton and give bill of lading. for it on the road, just as I do at Walter Shields' farm, where they often have cotton to ship."

J. R. Kenly, Assistant General Manager and Superintendent of Transportation of defendant, testified for defendant:

" We do not consider Spring Hill a regular station, because it is not equipped as regular stations are. A regular station is one at which an agent is stationed for transaction of the company's business, and at which shelter is provided for freights; in other words, a point at which we are able to receive, protect and deliver freights in our prescribed form. All freights shipped to an irregular station are required to be prepaid. At regular stations freight is collected at point of delivery. Between 29th October and 6th November, 1888, inclusive, Spring Hill was not a regular station. I think it ceased to be a regular station 1st January, 1887. It is now an irregular station.

" We have a policy in regard to irregular stations. We are frequently petitioned for flag stations. They usually offer the ground for station and to furnish agent. Our invariable answer is: We do not consider business sufficient to justify expense of agent, but for convenience of people we will permit trains to stop, with the understanding that the petitioners are to be responsible for any irregularity that may arise in delivery of freights at that point. We have no warehouse or agent at Spring Hill."

*Cross-examined.*—" There is a platform there; don't know whether there ever has been a warehouse there. Have been in my position since 1885. I said a regular station was one equipped with an agent and building for freights; a flag station is a very different one from an irregular station, though it may be one; we have lots of irregular stations that are flag stations. On main line few fast trains stop at all points, but will stop on signal, and it is noted on our tables by a dagger that train will stop on signal. An irregular station is always a flag station; a regular station is sometimes a flag station. I have not with me a table of stations and tariffs. (Local Freight Tariff No. 2 shown witness.) This is one of our tariffs; the title places on margin are stations; wherever there was a star, there was no agent; it seems, by this, that

in 1886 Spring Hill had an agent. (Circular No. 2095 shown witness.)   This is one of the company's circulars; the places on it are names of stations."

*Re-direct.*—" No. 2095 is a tariff of outgoing freights, going north, to Richmond.   If it was going south, it would designate the prepay stations; that is my impression.   I am not a freight agent."

Hassardshort recalled by defendant: "Always stop at Spring Hill to deliver mail; wouldn't always stop but for that.   When Spring Hill was regular station, Brinkley was agent, and cared for freight at his house."

His Honor instructed the jury that, upon the evidence, the place called Spring Hill was not a regular station, or depot, as contemplated by the statute, and, therefore, that their response to the first issue should be No.

The plaintiff put in evidence "No. 2 Local Freight Tariff, in effect October 1, 1886," in which "Spring Hill" is mentioned, with other stations, without any particular designation; and also "Circular No. 2095," of defendant, as to "rates on lumber to Richmond," in which "Spring Hill" is simply mentioned with other stations.

The Court gave judgment for the defendant, and the plaintiff, having assigned error, appealed.

*Mr. R. O Burton, Jr.*, for the plaintiff.
*Messrs. W. H. Day* and *J. M. Mullen,* for the defendant.

MERRIMON, J. (after stating the case).   The statute (*The Code,* § 1964) prescribes that "agents or other officers of railroads and other transportation companies, whose duties it is to receive freights, shall receive all articles of the nature and kind received by such company for transportation, whenever tendered at a *regular depot, station, wharf, or boat-landing,* and shall forward the same by the route selected by the person tendering the freight, under existing laws; and the trans-

portation company, represented by any person, refusing to receive such freight, shall be liable to a penalty of fifty dollars, and each article refused shall constitute a separate offence." It will be observed that such tender must be made " at a *regular* depot, or station," &c. The word " regular," as thus employed, is important and significant. It is descriptive and limiting in its meaning and application; it implies, in the order of the business of such companies, a settled, established, recognized depot, or station, and such tender of freight there as contradistinguished from an irregular, temporary, or casual place, fitted up, in some limited degree, for the purpose of receiving freight for shipment, for the convenience or accommodation of the shipper, or the company, or for the same of both. Such temporary places are not adapted to, and fitted up for, nor are they intended to be used in, the ordinary, orderly and continuous course of business. A great variety of circumstances and considerations might prompt a railroad company to depart from its regular course of business, especially when its road is new, in receiving various kinds of freight at places other than its regular depots and stations. It might be convenient—indeed, important—to its business to receive such freights as lumber, heavy timber, stone, brick, cotton, corn, or other ponderous freights, at irregular, temporary stations along the way, to be used for an occasion, for a week, or a month, or at intervals, as occasion might require. It might do so, not regularly, not for shippers generally, but for special considerations of convenience, or profit, when it could, or would, in its discretion. And it might provide side-tracks and other appliances for such temporary purposes. The statute clearly does not apply to and embrace such depots and stations. The word " regular," as employed, is intended to exclude such implication. If the purpose had been to include them, the appropriate language would be, " tendered at any and every depot, station," &c., or other like comprehensive terms.

The purpose not to include such irregular stations, is the more manifest because it would be impracticable, unreasonable and unjust to require such companies to receive freights at places where it had not made preparations for the general reception of the same. It is not to be presumed, in the absence of statutory provision, that the legislature intended to prevent - them from receiving freights on the way, now and then, more or less frequently, as their and the shippers' convenience might prompt. There is nothing in the general statute, of which the section under consideration is a part, that suggests such purpose.

A "regular" depot or station of a railroad company, as contemplated by the statute, is a certain place situate along. side of or near to its railroad, fitted up by it with suitable buildings, erections, appliances and conveniences for carrying on generally and continuously, in an orderly manner, the business of transporting freights, as is usually done by such companies. Such buildings, and other things necessary for a regular depot or station, may be greater or smaller in number and extent, or more or less elaborate, than others of like kind and for like purposes; but whether they be sufficient, or good, or indifferent, or are well or ill adapted to, and intended for, the purpose of prosecuting the business of transporting freights and passengers, receiving from shippers generally, and at all seasonable times, such freights as the railrord company is required to transport over its road, such depots or stations imply, ordinarily, such suitable and sufficient buildings, erections and appliances as may be necessary in receiving and delivering freights, and for the temporary protection of the same until they shall be transported or delivered to the persons entitled to have them, and that the company has a business office there, and suitable agents and employees to receive and deliver freights, to give receipts, bills of lading for the same, and to do the like and similar service. They are set-

tled, recognized places, to which shippers of freights may, at all appropriate times, go to ship, or receive the same. The law so requires, and such companies hold themselves out, at such places, to the public, as there ready and prepared to receive freights, and to do what should be done in respect to and about the same. It is at such places, shippers have the right, under the statute, to tender freights to the agents of such companies for transportation, and not elsewhere. *Kellogg* v. *Railroad Co.*, 100 N. C., 158; *Chicago & Alton Railroad Co.* v. *Flagg*, 43 Ill., 364; *State* v. *Railroad Co.*, 41 Conn., 134.

Now, applying what we have just said to the case before us, we think the Court below properly instructed the jury, in substance, that the whole evidence produced on the trial, accepted as true, did not prove that the plaintiff tendered the freight, as alleged in the complaint, to the agent of the defendant, at a regular depot or station on its road. It seems that, at one time, a considerable period before the tender of the lumber by the plaintiff, the defendant kept an office—a place of business—at the place designated as "Spring Hill;" but the witness for plaintiff does not say that a "regular" depot or station was there. On the contrary, his evidence tended to show that the defendant had received the plaintiff's lumber—not that of others—there, irregularly, from time to time, for a considerable while. The fact that the place was called "Spring Hill," that the mail train stopped there regularly to deliver the mail; that the place was set down, in circulars and orders of the company, as a *station*, did not, necessarily, make it a "regular" station. Regular, orderly business must have been done there; the defendant must have professed to do such business there; had suitable buildings and appliances, agents and employees there to give bills of lading, receipts, and the like, to shippers going there to tender or receive freights at all appropriate times. There was no depot, no freight, no agents, no

employees stationed there for such purposes at the time of the alleged tender, or for a long while before that time, and this, we think, fairly appears from the evidence taken as true.

If the plaintiff intended to insist upon his right to compel the agent of the defendant to accept the freight, or subject the latter to the penalty for the agent's refusal to do so, then he should have tendered it at a " regular station." He can have such penalty only in the case prescribed by the statute. It imposes the penalty only when the tender and refusal were made at a " regular " station, such as that pointed out above.

Affirmed.