FT. WORTH & D. C. RY. CO. v. STATE.*
(No. 8407.)

(Court of Civil Appeals of Texas. Ft. Worth. July 1, 1916. Rehearing Denied Oct. 14, 1916.)

1. RAILROADS ☞226 — STATION ACCOMMODATIONS—STATUTES—CONSTRUCTION.

Vernon's Sayles' Ann. Civ. St. 1914, art. 6592, as to station accommodations, requires that reasonably clean and sanitary comfort stations for men and women be maintained only where the railroad maintains a building commonly known as a depot.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 740; Dec. Dig. ☞226.]

2. RAILROADS ☞226 — STATION ACCOMMODATIONS—"DEPOT."

Neither a store building of an individual authorized to sell tickets and handle freight, wherein seats are installed for waiting passengers, nor a box car on trucks from which tickets are sold, and in which passengers wait and freight is stored, is a depot, so as to require installation of comfort stations in accordance with Vernon's Sayles' Ann. Civ. St. 1914, art. 6592.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 740; Dec. Dig. ☞226.

For other definitions, see Words and Phrases, First and Second Series, Depot.]

Buck, J., dissenting.

---

Appeal from District Court, Montague County; C. F. Spencer, Judge.

Action by the State against the Ft. Worth & Denver City Railway Company. Judgment for plaintiff, and defendant appeals. Reversed, and judgment ordered for defendant.

John Speer, of Bowie, and Thompson & Barwise and Geo. W. Wharton, all of Ft. Worth, for appellant. Paul Donald, of Montague, and Templeton & Milam, of Ft. Worth, for appellee.

BUCK, J. This suit was filed June 2, 1915, by the county attorney of Montague county, to recover penalties aggregating $15,400, for the alleged failure of the defendant railway company to comply with article 6593, Vernon's Sayles' Texas Civil Statutes, the petition alleging that for a period from July 1, 1909, until June 1, 1915, 308 weeks, defendant "maintained and kept a passenger depot building on its line of railway at the town of Fruitland; that within a reasonable and convenient distance from its said depot building, during all of said time, appellant had maintained water-closets for the accommodation of its passengers, and of its patrons and employés at such depot building; that it had, continuously during said time, a train schedule by which passenger trains regularly stopped at Fruitland in the nighttime, to take on and to discharge passengers, and that during that time its passenger trains were stopped at night at Fruitland for passengers; that during all of said time appellant had wholly failed, neglected, and refused to keep said water-closets and depot grounds adjacent thereto well lighted at such hours in the nighttime as its passengers and patrons at such station had occasion to be at the same, for the purpose of taking passage on the trains, or waiting for the arrival thereof, or after leaving the same, for at least 30 minutes before the schedule time for the arrival of said trains, and after the arrival thereof, wherefore appellant had become indebted to appellee in penalties, under the act of the Thirty-First Legislature of the state of Texas, in the sum of $50 for each of the 308 weeks mentioned, amounting in all to the sum of $15,400." Defendant answered by general demurrer and various exceptions, by general denial, by a plea to the constitutionality of the act upon which the suit of plaintiff was based, by a plea that the defendant was engaged in interstate transportation of passengers, and therefore was not amenable to the act mentioned, and by the further plea that for a greater portion of the time mentioned, it had kept the water-closets at said station well lighted and "sufficiently so to enable any and all persons who desired to use same to do so." The case was tried with a jury, and from a verdict and judgment in favor of the plaintiff in the sum of $15,000, the defendant appeals.

The evidence shows that for a period beginning prior to July 1, 1909, and ending about September 25, 1912, there was located on defendant railway company's grounds, and about 10 or 15 feet from the center of the track, a building used by J. T. Reeser, and after his death by his son-in-law, F. F. Green, and his two sons, Paul and John Reeser, for the purpose of conducting a mercantile business. While the land upon which the building was situated was owned by the railway company, the building was owned by Reeser and his heirs until the date of the fire. On this building and above the door Reeser placed, at the suggestion of the railway company, a sign furnished by it and reading, "Fruitland." J. T. Reeser, and later his two sons, John and Paul, in succession, were employed by the railway company to sell tickets, though it was not shown that they had authority to sell, or in fact ever did sell, a ticket beyond the state line. The railway company furnished such employé with a cap, to be worn while in the discharge of the railway company's business, with the name, "Agent," on the front thereof. Letters and other communications from the railway company to such person in charge were addressed to the "Agent at Fruitland." It was shown that such person, whom we will hereafter call "agent," was authorized by the railway company to receive freight for shipment, but was not authorized to make out bills of lading therefor, but that the shipper received from such agent a receipt for the goods delivered to the railway company and a blank bill of lading filled out with the description of the goods, to be signed by the agent of the railway company at Bowie or Sunset, according to whether the goods were being shipped north or south; that the agent, though not especially authorized so to do, did, in fact, receive and take care of some goods shipped to Fruitland, consisting principally of household furniture and of goods shipped to the agent himself, as a merchant. The agent received as compensation transportation for himself and perhaps his family, and the sum of $1 per month. The agent was also the representative of the Adams Express Company which shipped goods over defendant's railway. In this store was the post office and for part of the time a barber shop. It was shown that the main purpose of Reeser and others in securing the right to sell tickets for the railway company was the effect it would have in bringing trade to the store. There were placed in the front of the store settees or chairs for passengers waiting for, or disembarking from, trains. The store was painted the same color as other depots of defendant railway company by painters employed by the railway company to paint their depots generally, but the owner of the store paid for such work. The receipts from the sale of tickets during the period covered by the suit ran from $35 to $80 per month, or an average of $57.50, but the evidence fails to show any specific instance of a sale of

tickets for the midnight train, or what proportion of the average proceeds mentioned arose from sales for the night trains. Fruitland is a village of some 50 to 75 inhabitants within a radius of a half mile from the station, and the freight business is light. During a part of the period mentioned there were two stores, a blacksmith shop, two churches, and a Woodmen hall. Later one of the stores and the blacksmith shop were discontinued.

In November, 1912, after the store was burned, a box car was placed on the side track where tickets were sold, and such freight as was offered for shipment and could be placed therein, was stored. Seats were also placed therein for the accommodation of the public while waiting for trains. In the latter part of 1914, the railway company removed the trucks from under the box car, and continued to use it for the purposes hereinabove set out up to the time of the suit.

Prior to the burning of the store, passengers desiring to purchase tickets at night, or to take the train, there being one night train each way, stopping on signal, or to discharge passengers having tickets for Fruitland, were accustomed to go to the agent's house and inform him of their desire. Ordinarily they waited for trains either at the agent's house, or at the house of some neighbor, up to 30 minutes before train time, when the agent would open up his place of business. The water-closets were some 300 feet in front of and south of the store, and when the store was open a lamp was ordinarily placed on the counter, and the light therefrom, shining through the door, would extend out towards the closets, but no lights were placed in or near the closets during any of the time in controversy. During the entire period from July 1, 1909, to the date of the suit, no one ever asked the privilege of using the toilets at night, or made any complaint that they were not properly lighted.

We believe the foregoing is a fair statement of the facts developed on the trial, and is sufficient for the purposes of this opinion, and will so be considered, unless it shall appear further in the course of the opinion necessary to note other evidence.

Appellant urges in a group of kindred assignments: First. That the evidence is insufficient to show that it maintained a depot at Fruitland: (a) From July 1, 1909, to September 25, 1912; (b) during the period when the box car used as a place for selling tickets was on wheels; and (c) during the time after the trucks were removed therefrom. Second. By another group of assignments, that the act of the Legislature under which this suit was brought is in violation of the Fourteenth Amendment to the United States Constitution, in that it is an effort to deprive the defendant of its property without due process of law, and to deny it the equal protection of the law. Third. By another group of assignments, that said act is void because

too vague and indefinite, and because it gives no reasonable rule or standard by which a railway company could know when it had furnished a well-lighted water-closet, and adjacent depot grounds. Appellee cites, in support of the contention urged in this group, State v. T. & N. O. Ry. Co., 103 S. W. 653, M., K. & T. Ry. Co. v. State, 100 Tex. 420, 100 S. W. 766, and other cases.

[1] In construing article 6592, Vernon's Sayles' Texas Civil Statutes, requiring railroads and railway corporations to maintain and keep reasonably clean and sanitary suitable and separate water-closets for both male and female persons at each passenger station on its line of railway, either within its passenger depot, or in connection therewith, etc., it was held, and we think properly so, by the Court of Civil Appeals for the First District, in State v. Jasper & E. R. Co., 154 S. W. 331, that such act only requires the erection and maintenance of toilets by railroads at stations where it has constructed and maintains a building, commonly known as a "depot," for the accommodation and protection of passengers received and discharged thereat, and does not require such maintenance at way and flag stations where no depot or building has been erected.

[2] Therefore, in consideration of the questions raised by appellant's first group of assignments, we must determine whether or not the use by the railway company of either of the structures from which tickets were sold during the period covered by this suit was in the contemplation of the statute, a depot. In Railway Co. v. Smith, 71 Ark. 189, 71 S. W. 947, it is said:

"The term 'depot' usually includes, not only the idea of a stopping place [for trains], but also that of a building, or something of the kind, for the protection and convenience of passengers and freight."

In Karnes v. Drake, 103 Ky. 134, 44 S. W. 444, it is said:

"When we speak of a depot at a railroad, we mean a building which is used for the accommodation and protection of railway passengers or freight."

Other definitions of similar import are found in State v. Edwards, 109 Mo. 315, 19 S. W. 91; Railway Co. v. State, 61 Ark. 9, 31 S. W. 570; Maghee v. Camden, etc., Transp. Co., 45 N. Y. 520, 6 Am. Rep. 124; State v. New Haven & N. Co., 37 Conn. 163; Plunkett v. Minneapolis, etc., Ry. Co., 79 Wis. 222, 48 N. W. 519; Fowler v. Loan & Trust Co., 21 Wis. 79; L. & N. Ry. Co. v. Commonwealth, 33 S. W. 939, 17 Ky. Law Rep. 1136.

In State v. T. & P. Ry. Co., 173 S. W. 900, the Court of Civil Appeals for the Dallas District, held, in construing article 6592, supra, that said article applied only to stations where a building is erected for the protection and accommodation of passengers and freight, and that it did not apply to the place where trains stopped for passengers, but where no building of any kind for passengers or freight is maintained, though the

merchant near such stopping place was authorized to sell tickets; as a "depot," in the usual and recognized meaning of the word, which the Legislature must have intended, is a building for the accommodation and protection of passengers and freight. In that case the company having no agent at Crow, in Wood county, the merchant applied to it for permission to sell tickets over the road, which was granted, and he was furnished tickets, which he kept in his storehouse, where the post office was also kept, and for selling tickets he was allowed a commission which amounted on an average to $10 per month; the sales amounting to about $100 per month. The road did not have any interest in the building, nor did it furnish any place for selling the tickets, nor any accommodation in the building for outgoing or incoming passengers. The merchant procured the right to sell tickets for the purpose of drawing trade for his mercantile business. Crow was a prepaid station for freight, and the merchant handled none, except his own, or in particular instances for accommodation when he was requested by parties to look after it. The railway company furnished him with blank bills of lading, but he was not authorized to sign them, but would furnish parties with one who wished to fill them out and get them signed at the next station. The merchant owned two privies, one about 300 feet from his store, and the other in his residence near his store, which parties were permitted to use when request was made therefor. Ladies waiting for a train generally went to his house to call on his wife.

The facts in the cited case are very similar to the facts in the case at bar, probably the only distinguishing feature being that in the instant case the building used was on the railway company's grounds, while in the cited case it apparently was not.

In Ry. Co. v. State, 61 Ark. 9, 31 S. W. 570, in a suit involving the construction of a statute requiring railway companies to provide separate waiting rooms for the white and African passengers in all of the passenger depots, it was held by the Supreme Court of Arkansas that a store on a railroad company's right of way where railroad tickets were sold, and which was resorted to by passengers while waiting for the cars, and over which the company had no control, was not a passenger depot within the meaning of the article. See, also, State v. B. & O. R. R. Co., 61 W. Va. 367, 56 S. E. 518; St. L., I. M. & S. Ry. Co. v. Berry, 86 Ark. 309, 110 S. W. 1049; Land v. Wilmington & W. R. Co., 104 N. C. 48, 10 S. E. 80.

The majority, at least, are of the opinion that in the use of the building on its grounds for the purposes indicated from July 1, 1909, to September 25, 1912, the railway company did not maintain a depot in the sense in which the word is used in articles 6592 and 6593, and therefore that it cannot be held liable for a failure to keep well lighted the water-closets near to said building and used in connection therewith. They are further of the opinion that in the use of the box car on wheels the railway company did not maintain a "depot," in the sense in which the word is used in said articles. St. L., I. M. & S. Ry. Co. v. Berry, 86 Ark. 309, 110 S. W. 1049; R. R. Co. v. Smith, 71 Ark. 189, 71 S. W. 947. Therefore the majority hold that no recovery can be had for the time the box car used as a place for selling tickets was on trucks. They are of the opinion that while said car was temporarily used as a place for selling tickets, yet it was a part of the rolling stock of the company, and in no sense does it measure up to the requirements of the word, "depot," as defined in Railroad Co. v. Smith, supra. As was said in that case:

"A 'box car' is not a building. The latter implies a permanent structure, and not a part of the rolling stock of the company, which may be moved at will along the line of the. railroad. We think that the word 'depot,' as used in the deed, was intended to mean a permanent structure of some kind to be used as a receptacle for freight and passengers, and was to be of the kind the railway company erected at similar stations along its line of railway."

As to the use of the box car after it was taken from its trucks, covering a period from the latter part of 1914 until June 1, 1915, both Chief Justice Conner and Associate Justice Dunklin believe that the railway company should not be held liable for the penalties claimed. Justice Dunklin is of the opinion that in the light of the authorities cited and others to the same effect, such a structure could not be held to be a depot in the sense used in this statute. He is of the opinion, further, that as the earnings of the company from the maintenance of the depot in question were of insubstantial amount; as all public officers charged with the duty of enforcing the statute, as well as the public generally, by their silence acquiesced in the belief, apparently entertained by appellant in good faith, that there had been no infraction of the statute; as the depot was not used to such an extent as even to suggest that the failure of appellant to maintain the lights contemplated by the statute caused any damages or inconvenience to any one for whose benefit it was enacted, and as the punishment of $15,000 appears, under all the circumstances, to be extremely severe— the case calls strongly for the application of the rule announced in Sutherland on Statutory Construction, §§ 208, 347, that penal statutes, fixing penalties designed to enforce their observance and not as reparation to any party that may be injured by their violation, must be strictly construed, and the more severe the penalty, the more strict the construction. He is of the opinion, further, that as the use made of the box car at the station is the only basis for the contention that it was a depot building within the meaning of articles 6592 and 6593 of our

statutes, and as no one could contend that the car, either with or without trucks, was such a building before it was applied to that use, there is no more reason for holding that by such use, as a mere makeshift, the car was metamorphosed into a depot building than there would be for holding that a flat car, or a depot platform, or even a discarded locomotive, would likewise become such a building if applied to the same uses. And, further still, he is of the opinion that as those statutes do not specifically provide that a storehouse belonging to another and used by him as Reeser and his sons used the store in the present suit, or a box car used as the car in question was used by the railway company, shall be considered as a depot building, within the meaning of the statutes, and that as the question whether or not such is their meaning is one of construction, governed by the general law of statutory construction, the reasons advanced in the decision of the Supreme Court of the United States in the case of S. W. Tel. & Tel. Co. v. Danaher, 238 U. S. 482, 35 Sup. Ct. 886, 59 L. Ed. 1419, L. R. A. 1916A, 1208, for holding that the judgment of the trial court in that case should not be enforced apply with full force in the present case, in which the judgment complained of is even more oppressive and severe; and that it would be unreasonable to suppose that in enacting those statutes, the Legislature ever intended that they should be given such a construction.

Chief Justice Conner, while in some doubt as to whether or not the structure last mentioned should be deemed a depot, in the sense in which it is used in the statute, yet is of the opinion that, by reason of the long acquiescence, or ' implied acquiescence, on the part of the state and its representatives in Montague county in the conclusion evidently reached by the railway company that such a structure was not a depot, and the reliance thereon by the railway company in good faith, and, in view of the somewhat diverse holdings by the appellate courts as to the construction of the kindred statute (article 6592, Vernon's Sayles' Texas Civil Statutes), it having been held, in State v. T. & N. O. Ry. Co., 103 S. W. 653, and M., K. & T. Ry. Co. v. State, 100 Tex. 420, 100 S. W. 766, violative of the Fourteenth Amendment to the United States Constitution, though its constitutionality was later in effect sustained, that it would be oppressive and in effect violative of the Fifth and Fourteenth Amendments to the United States Constitution to permit such a large recovery against the railway company in this case under the circumstances stated and covering the period of the state's acquiescence. In this particular, as he considers, there is ground for an application of the view presented in S. W. Tel. & Tel. Co. v. Danaher, 238 U. S. 482,

35 Sup. Ct. 886, 59 L. Ed. 1419, L. R. A. 1916A, 1208. In the cited case the plaintiff sued the defendant telephone company for alleged discrimination against her and the refusal to furnish her with telephone service, except upon certain alleged unreasonable conditions. The recovery in the trial court was sustained by the Supreme Court of Arkansas, and an appeal was taken to the Supreme Court of the United States. Justice Van Devanter delivered the opinion for the latter court. After stating that the state Supreme Court held that the statute, under which the suit was brought, was constitutional, and the regulation and requirement of the defendant company as a prerequisite to furnishing plaintiff with the desired service was unreasonable, and its enforcement against the plaintiff was a discrimination against her, and that upon this construction of the statute the holding of the state Supreme Court was binding upon the United States Supreme Court, yet it was further held that, inasmuch as the state Legislature had not declared such a regulation on the part of the defendant company unreasonable, and as in good faith the company had adopted and promulgated the rule and required observance of it on the part of its patrons, and was guilty of no intentional wrongdoing, and no departure from any prescribed or known standard of action and no reckless conduct, to inflict upon it the heavy penalty recovered in the suit ($6,300) was plainly arbitrary and oppressive, and in violation of the Fourteenth Amendment prohibiting the taking of property without due process of law. Therefore the majority conclude that the judgment should be reversed and judgment be here rendered for appellant; that plaintiff take nothing by reason of its suit.

The writer does not agree with some of the conclusions reached by his Brethren; but, owing to the nearness of the end of this term of court, and the press of other work, will not here attempt to enter the reasons for his dissent, but will later file them.

Judgment reversed, and here rendered for appellant.

BUCK, J. (dissenting). As indicated in the majority opinion, the writer is unable to entirely agree with some of the conclusions reached by the majority. He will here briefly note the grounds of his dissent. He recognizes the severity of the penalty which the trial court's judgment visits upon the railway company for its alleged failure to comply with the statutory requirements, yet if it can be reasonably said that the appellant company disregarded the plain provisions of the law, it cannot be relieved of the consequences thereof simply because they are onerous. Waters-Pierce Oil Co. v. Texas, 212 U. S. 86, 29 Sup. Ct. 220, 53 L. Ed. 417, 430.

The writer is unable to avoid the conclu-

sion that in the use by the railway company of the storehouse it maintained a "depot," in the sense in which the word is used in the statute under which this action is brought. The fact that the railway company did not own the ground upon which the building stood, it seems to the writer, would not affect the duty of the appellant to comply with the law. As he sees it, the railway company might own the building and lease the ground, or rent the building and own the land, or own both, or lease both, and yet "maintain a depot," if the structure was a building used by such company as a place provided by it for the protection and convenience of its passengers. It is commonly known that railroad companies, owning their depots in cities, let parts of their buildings to express companies, to news companies, to the postal department of the United States government, and for other purposes not directly connected with the railway service, and yet the portions of such buildings used strictly for the protection and convenience of their passengers are none the less depots.

The evident purpose of the act under consideration was to provide for the accommodation of employés in and around the depots and of passengers while waiting for trains, or after disembarking therefrom. Therefore it certainly was not contemplated by the Legislature that a railroad could, with impunity, avoid the prescribed duty by renting a building rather than owning it, or by securing a building for depot purposes, not owned by the railroad, and for which no money rent was paid. Without reference to where the title to a building or to the ground upon which it was erected might be vested, the question to be determined is, Was the railway company maintaining a depot?

"It is unquestionably a fundamental canon of construction that such interpretation shall be given to acts of the Legislature as will effectuate the intent and purpose of the lawmakers in their enactments, when the intent of the law is plain and obvious, rather than to follow its literal import or a mere grammatical construction" Ellis County v. Thompson, 95 Tex. 32, 64 S. W. 927, 66 S. W. 48.

In Russell v. Farquhar, 55 Tex. 359, Judge Moore uses the following language:

"While it is for the Legislature to make the law, it is the duty of the courts to 'try out the right intendment' of statutes upon which they are called to pass, and by their proper construction to ascertain and enforce them according to their true intent. For it is this intent which constitutes and is in fact the law, and not the mere verbiage used by inadvertence or otherwise by the Legislature to express its intent, and to follow which would pervert that intent."

In 2 Lewis Sutherland's Stat. Const. (2d Ed.) § 347, the author says:

"It is indispensable to the correct understanding of a statute to inquire: First, what is the subject of it; what object is intended to be accomplished by it? When the subject-matter is once clearly ascertained and its general intent, a key is found to all its intricacies; general words may be restrained to it, and those of narrower import may be expanded to embrace it to effectuate that intent. When the intention can be collected from the statute, words may be modified, altered, or supplied so as to obviate any repugnancy or inconsistency to such intention."

See, also, Hill & Morris v. Railway Co., 75 S. W. 874; State v. Railway Co., 37 Conn. 153; Railway Co. v. Thornsberry, 17 S. W. 521.

With these fundamental principles governing statutory construction in mind, it is difficult for the writer to see that the duty and relationship of the railway company to its employés and passengers employed in and frequenting the building used at Fruitland as a depot, would in any way be affected by the fact that the railway company did not own the building, used, in part at least, by it for railway and depot purposes. It had constructed closets, thereby evidently recognizing the need therefor; the building was used by the passenger public practically in the same way and to the same extent that it would have been used if it had been occupied only for railway purposes. The agents of the railway company were none the less employés, for whose benefit in part the statute was enacted, because the money consideration or salary paid them was nominal. The benefits accruing to such agents were none the less real and substantial because they did not come in the form of a salary. The right to have the storehouse building placed upon the railway company's ground was a valuable, if not an expressed, consideration. The writer thinks the case at bar is distinguishable from the Crow Case, 173 S. W. 900, cited in the majority opinion, in several respects, at least: (1) In the Crow Case, the railway company did not own or furnish the ground upon which the storehouse was located; (2) in this case the building was located 10 or 15 feet from the center of the track, while in the cited case the house was located 76 feet from the track, and off the right of way; (3) in the instant case the sign "Fruitland" was furnished by the railway company, in the cited case the sign, "Railroad Ticket Office," was placed over the front door of the store by Greer himself; (4) in the instant case the railway company furnished the closets, while in the cited case such closets as there were, were furnished by Greer, and were, inferentially, the closets used by him in connection with his business and in his home prior to the time that he secured the right to sell tickets for the railway company. These differences, though, perhaps, slight in any one instance, when taken together, may reasonably be sufficient to have justified the trial court in holding, in the instant case, that the building was a depot used for railway purposes by the railway itself, and in the cited case that it was not.

While the writer is not thoroughly convinced that the box car, either with or without trucks, was a depot in the sense the word is used in the statute, yet he does not

think that the Berry Case, cited in the majority opinion, is sufficient authority for holding that it was not. In concluding in the Berry Case that a box car was not a depot, the Supreme Court of Arkansas had under consideration the question whether the placing of a box car on a side track, and at which freight was received and cars stopped when flagged, was a compliance by the railway company with a stipulation in the deed that it would put a "depot on the land." Berry was part owner of a large tract of land along the railway company's right of way, and in part consideration for the conveyance to the railway company of a right of way, including siding, depot grounds, etc., through his land, he stipulated that the railway company should erect a depot. In the sense in which the word was used in the deed, and in consideration of the evident purpose of the grantor in making a stipulation, the expectation of the consequent enhancement in value of his lands and the convenience to those living and working thereon, the writer believes that the court correctly held as it did. But he is not so certain that in the instant case the same construction should follow.

Without extending these remarks further, the writer respectfully enters his dissent, believing that the state was entitled to recover the statutory penalty for the period beginning July 1, 1909, to September 25, 1912, when the depot or storehouse was burned, and that at most the judgment should be reformed so as to allow recovery only for the period mentioned.