## Town of Sumner, Miss. *v.* Illinois Central R. R. Co., et al.

No. 41080 April 13, 1959 111 So. 2d 230

*Carlton & Henderson,* Sumner, for appellant.

*Byrd, Wise & Smith, Wm. O. Carter, Jr.,* Jackson; *J. H. Wright, John W. Freels,* Chicago, Illinois, for appellees.

344

LEE, J.

The Illinois Central Railroad Company, which operates a line of railroad through the Town of Sumner, Mississippi, one of the two county seats of Tallahatchie County, and which maintains a depot at that point with an agent to serve the public from 7:25 A. M. to 4:25 P. M. each day, Monday through Friday, was joined by Railway Express Agency, Inc. in a petition to the Public Service Commission to discontinue their agencies from January 1st through August 31st, of each year, thus making them prepay stations for that period, but, for the balance of the year, that is, from September 1st through December 31st, during the cotton season, the agencies would be revived. The Town of Sumner contested the petition.

The proof showed that, if the relief prayed for was granted, the depot at Sumner would be locked during the eight-month period, as stated above, and would be manned by no railroad personnel whatever. No agent would be present to receive outgoing, or deliver incoming, shipments. The consignees of carload or less than carload shipments would be required either to establish credit with the Railroad Company, or have their shipments prepaid at the points of origin. Except when a railroad truck and its driver or a train and its crew happened to be present, shippers would prepare bills of lading and deposit them in a box at the warehouse. The Railroad Company would accept no responsibility for the shipment however until one of its employees picked up the bills of lading, deposited in the box, and signed the same. Shippers, to get their bills of lading, would have to obtain a key, unlock the box, and thereby procure the same. Incoming shipments, less than carloads, would be placed in the warehouse by railroad employees; and

consignees, in order to get their feight, would be required to obtain a key from a designated person, unlock the warehouse, and obtain the same. Breakage or damage could not be pointed out at the time as no agent of the Company would be present. Neither would there be an opportunity to make claim for damages through that office. Accommodations to shippers will be less at such a station. Pick-up and delivery service, in effect at present, is not contemplated in the proposal. Legal notice, by mail, would be one day late, because it would be sent from a nearby station, although shippers may waive this requirement and accept notice by telephone, if they have such facility.

The Public Service Commission, holding that the proposal as contained in the petition, would not conform to the provisions of Section 187 of the Constitution, declined to grant the relief prayed for. On appeal to the Circuit Court of Hinds County, the learned judge held that the proposed prepay station would amount to a substantial compliance with the Constitution, and that elacticity in interpretation should be indulged in order to meet changing economic conditions. He therefore reversed and set aside the order of the Commission. From the judgment entered, the Town appealed.

The question for determination is whether or not a depot, maintained for eight months in the year in the manner here inabove set out, constitutes a substantial compliance with Section 187 of the Constitution.

The Constitution of 1890 took effect on November 1, 1890, before the railroad here in question was built. Section 197 thereof required all owners or projectors of railroads thereafter to be built, either entirely within the State, or partly in this State and partly in another state, or in other states, to incorporate under the laws of his State.

No reference whatever to railroad depots generally was made in the Constitution. But it was specifically

provided that, where a railroad passed through a county seat, a depot should be established and maintained therein. This was provided by Section 187 thereof, which is as follows: "No railroad hereafter constructed in this state shall pass within three miles of any county seat without passing through the same, and establishing and maintaing a depot therein, unless prevented by natural obstacles: Provided, Such town or its citizens shall grant the right of way through its limits, and sufficient grounds for ordinary depot purposes."

The reason for the adoption of this provision was that, prior to 1890, railroad companies, in a number of instances, had refused to build their lines through county seats. Mississippi Constitutions by George H. Ethridge, p. 348. The framers of the Constitution were evidently of the opinion that, in the future, newly built railroads, if they passed within three miles of a county seat, should serve the town and its citizens. To that end, and to make certain that there would be no recurrence of refusals in such cases by railroads, it was expressly provided by Section 187, supra, that a railroad, if it passed within three miles of the county seat, must pass through such county seat and establish and maintain a depot therein, unless prevented by natural obstacles, if the town or its citizens would grant the right-of-way and sufficient grounds for ordinary depot purposes.

This Court in State v. Railroad Company, 86 Miss. 172, 38 So. 732, in passing on the purpose and intent of Section 187, pointed out why the framers of the Constitution made the distinction between county seats and other towns saying: "the reason for the distinction which was made between county seats and other towns being most probably that the framers of the constitution realized that to make the section apply to all towns would inevitably tend to discourage the building of other railroads, and would thus materially retard the development of many sections of the state. Hence the section was

restricted in its application to county seats alone, the purpose undoubtedly being to protect the interests of the county which had expended money in the erection of public buildings, and of citizens who had invested their money at the same place because of the existence of the buildings and the permanent location there of the seat of justice, by securing to such towns and their citizens the facilities and advantages afforded by railroad transportation, and protecting the property situated in such towns from being depreciated and practically destroyed in value by the building up of another competing town at the nearest point on the railroad. We hold that the true meaning of Sec. 187 is that the burden is imposed upon every railroad company whose road passes within three miles of any county seat to run through the corporate limits of the town as they exist at the date of the construction of such road, and to maintain therein a depot, unless such construction be absolutely prevented, not by increased cost or greater engineering difficulty, but by 'natural obstacles' which cannot reasonably be overcome.''

In addition to protecting the interest of a county and its citizens in the value of property in the county seat, it might have also been said that, in those days, most taxpayers paid their taxes in the coin and currency of the realm, going to the county seat in person to do so; that the courts, both circuit and chancery, held their terms at the county seat, where people were called as litigants, jurors, or witnesses; that the board of supervisors, the managers of the county's business, held their meetings at the county seat; that citizens were required to go to the county seat oftentimes for the execution, and, at all events, for the recordation, of deeds and other conveyances; and that professional talent and counsel could be obtained at the county seat. In other words, the county seat was an important place in the life of the citizenship of the county, and was a place necessarily

frequented by many of the citizens. Consequently, the railroad, passing within three miles, was not only required to pass through, but in addition, to establish and maintain a depot therein so that the people generally, when they found it necessary to go to the county seat, would be able to transact any and all business which it might be necessary or convenient for them to have with the railroad company. Besides, an agent at the depot or station would facilitate and assure prompt and convenient service of process in controversies between the county and its citizens and the railroad company.

In 1890, except for animal drawn vehicles such as carts, buggies, surreys and wagons, the principal means for passenger travel and freight deliveries was by railroads. At that time, this means of transportation had not attained its full expansion, and many lines were subsequently built. Depots, in those days, were places where passengers were received and discharged and where freight was accepted for shipment and was delivered to consignees. Employees were present for that purpose and to serve the needs of potential patrons. They were not locked buildings without personnel as contemplated by the proposal in this case.

It is conceivable and beyond the wildest stretches of the imagination that the framers of the Constitution, in the year 1890, when they required railroads to establish and maintain depots in county seats, intended that this mandate would be satisfied by the construction of a building, which would be called a depot, but which, for eight months of the year, would be locked, with no agent present to transact business with the people, and further maintained in the manner shown in the statement of facts in this case.

The purpose and intent of the framers of the Constitution at the time of its adoption must be preserved. In State v. Railroad Company, supra, this Court said: "A constitution is framed for the guidance and

government of the whole people, and words used therein are to be given their usual and popular signification and meaning; and, unless that be the manifest intention of the framers of the instrument, phrases or terms susceptible of two different interpretations are not usually to be given a restricted, narrow, or technical construction." There was no equivocation in Section 187. The establishment and maintenance of depots in county seats was not limited to cases in which such depots might be reasonably necessary for the public convenience. The State had the power to lay down the conditions upon which railroads could be built. Section 197, supra. It did lay down the conditions, and the same were in effect when the railroad here in question was built. No judicial question can be involved. Section 187 is simply one of the "Thou Shalts" of the supreme law of the State, and this provision cannot be nullified by a strained and unjustified interpretation.

 ▇ In 1889, just a short time before the adoption of the Mississippi Constitution of 1890, the Supreme Court of North Carolina in Land v. The Wilmington and Weldon Railroad, 104 N. C. 48, 10 S. E. 80, with reference to what the terms "a regular depot," or "station," of railroads signified at that time, said: "such depots or stations imply, ordinarily, such suitable and sufficient buildings, erections and appliances as may be necessary in receiving and delivering freights, and for the temporary protection of the same until they shall be transported or delivered to the persons entitled to have them, and that the company has a business office there, and suitable agents and employees to receive and deliver freights, to give receipts, bills of lading for the same, and to do the like and similar service. They are settled, recognized places, to which shippers of freights may, at all appropriate times, go to ship, or receive the same."

The appellants, in their belief, cite a number of cases from other jurisdictions in which definitions of depots

or stations are given. None of these decisions are analogous to the question now before the Court. Other cases from this jurisdiction are also cited, but none of them involved a construction of Section 187. In Citizens of Stringer v. G. M. & O. R. Company, 229 Miss. 1, 90 So. 2d 25, and Mississippi Public Service Commission (Town of Lorman, Mississippi) v. I. C. R. R. Company, et al., 235 Miss. 47, 108 So. 2d 573, prepay stations in the small Towns of Stringer and Lorman, similar to the proposal in the present case, were approved because the public convenience did not require a full-time agency. But Section 187 was not involved in those cases. The towns were not county seats. Besides, the establishment and maintenance of those stations was governed by statute, namely, Section 7847, Code of 1942, Recompiled, the topical provision and the first sentence of which are as follows: "Necessary depots to be maintained. Every railroad shall establish and maintain such depots as shall be reasonably necessary for the public convenience, and shall stop such of the passenger and freight trains at any depot as the business and public convenience shall require. * * *"

The basic consideration in the foregoing statute is the public convenience and necessity. That, obviously, is a judicial question. The Court was manifestly correct in its use in those opinions of the following language to wit: "We have no statute which imposes upon a railroad company the absolute duty to maintain an agency station. In the absence of such a statute, the duty of the railroad company, if any, is to maintain an agency station where it is reasonably necessary to do so and where the public convenience requires it."

The maintenance of the depot, as proposed, does not comply with Section 187 of the Constitution. Under that provision, in addition to a building for the receipt and delivery of freight, the Railroad Company must have an agent or agents at appropriate times during

reasonable business hours available to serve shippers and consignees of freight, and meet fully the requirements of a railroad depot or station.

From which it follows that the circuit court erred in reversing and setting aside the order of the Public Service Commission. Consequently the judgment of the circuit court is reversed, the petition is dismissed with prejudice, and judgment will be rendered here for the appellant.

Reversed, petition dismissed with prejudice, and judgment for appellant.

*McGehee, C. J.,* and *Hall, Kyle, Arrington* and *Ethridge, JJ.,* concur.

Roberds, P. J., dissenting.

The question for decision is whether the system proposed to be adopted by the Illinois Central Railroad Company and the Railway Express Agency, Inc. would be a substantial compliance with the requirement of Sec. 187 of the Constitution of Mississippi under present-day conditions. Able counsel for the Town of Sumner in his brief says the only question in the case is ''whether or not such type of operation meets the requirements of the constitutional provision.'' A stipulation between the parties states the proposition to be whether ''the closing of the Sumner agency is in violation of the provisions of Sec. 187 of the Mississippi Constitution of 1890 in this cause.'' The learned trial judge stated the proposition in these words: ''The Town of Sumner contends that in order to maintain a depot, an agent must at all times be on duty. Their contention amounts to just that in the last analysis.'' The commission on motion of the Town of Sumner, dismissed the petition. Therefore, no question is presented in this proceeding as to whether the proposed service meets the necessities and

conveniences of the public in and about the Town of Sumner.

Before entering upon a discussion of the meaning of the section as applied to the railroad, it may be helpful to clarify the situation by noting at this point that one of the appellees is the Railway Express Agency. No serious contention is made upon this appeal to show that the service proposed is not reasonable and adequate as to that agency. Said Sec. 187 has no application to the Express Agency.

In my opinion the requirements to establish and maintain a depot was to afford reasonable service to those having business with the railroad at the depot. I think that was true at the time the section was adopted and is true at the present time under existing conditions. It may be helpful to note the changed conditions. The controlling opinion makes note of the fact that the only method of transportation in 1890, aside from walking and use of railroads, was by horse drawn vehicles. There were no hard surfaced public roads. At this time vehicles for transportation are practically all propelled by motors, including airplanes. Indeed, without going into detail, methods of transportation have perhaps changed more since 1890 than they had changed from the beginning of time to that date. This thought is especially applicable to the situation at Sumner, with the paved highways, automobiles and motor trucks carrying passengers and freight. These motor vehicles have largely supplanted railroads in the transportation of passengers and freight. Indeed, there is no passenger service at all at Sumner. All of this means, as was stated in the petition herein, that the railroad would have to maintain a fulltime agent at Sumner at considerable loss.

Now just what is the proposed system? For four months in the year, during the busy season, a regular station agent is on the job. During the remaining eight months the station is operated as a kind of self serv-

ing system. The same building, grounds, tracks, and equipment are used as during the busy season. If the shipment is outgoing in a carload lot the shipper orders the car; it is placed by the railroad on the side track, the shipper loads his goods and ware into the car and locks it up and issues to himself a bill of lading which he places in the bill box and which bill of lading is signed by a truck driver of the railroad, or a member of the train crew, whichever appears first, and then the bill of lading is mailed to the shipper. If the outgoing shipment is less than a carload, the shipper procures the key to the warehouse from some responsible person with whom the railroad placed the key, who is conveniently located to the warehouse, and such shipper issues a bill of lading and places it in the bill box and an authorized railroad agent signs the bill of lading and it is mailed to the shipper. On incoming shipments, if the shipment is in a carload lot, the car is switched onto the side track and the consignee is notified and comes forth to unload his freight. Such shipments are prepaid unless the consignee has established credit with the railroad. If the incoming shipment is less than a car load, the goods are placed in the warehouse and the consignee is notified and he appears to take possession of his goods, and if a railroad employee happens to be present he delivers the goods to the consignee. If such employee is not present the consignee procures the key from the custodian and gets his freight out of the warehouse. That roughly is the system employed. The evidence shows there are between 600 and 700 such prepay stations in use by the Illinois Central Railway System. Able counsel for the Town of Sumner says this system has come into use since 1930. No doubt he is correct in that statement and no doubt the reason for the existence of the system is because railroad revenues have fallen off to such an extent that they cannot afford to keep a regular live agent at these stations all of the time.

The Town of Sumner suggests that the opportunity for loss of freight or larceny thereof is inherent in the foregoing system. However, the proof in this case shows that the trainmaster for the Mississippi territory of the appellee railroad has from 50 to 75 prepay stations under his supervision and there was not a single case of loss on station freight during the previous year.

The trial judge summed up his findings on the testimony in these words: "The proof shows, without going into detail, that substantially all of the services rendered by a railway station are being offered at Sumner, except that no fulltime agent is to be stationed there except during the cotton shipping season, and that at other times the services described as pertinent to a prepay station will be offered to the residents of the town." Again he said: "About the only person really inconvenienced as a shipper is the person who is unable to arrange credit for his shipments with the railroad company. Such persons using the railroad are few and far between, and certainly his shipping requirements would be inconsequential and not sufficient to alter the results."

It is shown that the Town of Webb is only two miles from Sumner. The railroad has a live station at Webb. A paved road connects the two towns and they are on the same telephone system and those needing railroad service in the community of Sumner could very easily use the agency at Webb.

In State v. Railroad Company, 86 Miss. 172, this Court explaining the reason for adoption of said constitutional section, said: "* * * * one great evil which was sought to be guarded against being that companies organized for the real or ostensible purpose of constructing railroads would often extort large grants and donations of lands, money, or bonds from the towns or their citizens by the threat of locating the projected line of railroad just beyond the confines of the town, and there establishing a depot and building up a rival market, having

the advantage of railroad transportation and cheaper freight rates, against which the inland town, under the inexorable laws of commerce, could not hope to successfully contend, it being a matter of familiar knowledge that the location of a railroad within a short distance of a town not possessing similar or adequate transportation facilities necessarily and inevitably operates to the great detriment of the financial and business interests of such town." The possibility of this evil resulting from the construction of railroads has disappeared. No more railroads are being constructed in the State of Mississippi.

It will be noted that the constitutional provision does not expressly require that a live agent be on duty at all times at a county seat. Nor does it undertake to regulate hours or time or prescribe the type or character of buildings. It uses the word "depot." The specific question has been dealt with by the courts. In the case of Missouri-Kansas-Texas Railroad Company of Texas v. Fowler, 290 S. W. 2d 922, the wording of the statute was substantially the same as the wording of our constitutional provision. The railroad applied to the railroad commission for authority to discontinue its agency at a certain station and substitute a prepay station except during the cotton shipping season. The application was granted by the commission and the protestants appealed to the Court of Appeals of Texas. The appellants contended that the statute required the railroad to render agency service, just as is contended in the case at bar. The Court of Appeals held that the personal agency service for three months and the prepay station service for nine months complied with the requirements of the statute.

In the Illinois Central Railroad Company v. Illinois Commerce Commission, 397 Ill. 387, 74 N. E. 2d 526, the statute required "that all railroad companies in this state carrying passengers or freight shall, and they

are hereby, required to build and maintain depots for the comfort of passengers and for the protection of the shippers of freight where such railroad companies are in the practice of receiving and delivering passengers and freight, at all towns and villages on the line of their roads having a population of 200 or more.'' The court discussed a number of cases which construed the word ''depot'' and maintenance of a depot and concluded ''it would logically follow that by the requirements to maintain a depot it did not necessarily follow that this also required a maintenance of an agent to operate it.'' The court further said: ''It must be remembered that the appellee railroad company is not seeking to close the depot, or to not render good service in connection with the depot, but simply to render it in a less costly manner, as a non-agency station rather than as an agency station. We think there is nothing in the Toledo, St. Louis & Western Railroad Co. case which requires that an agency be maintained, but only a depot, without an agent, unless this 'would be confiscatory'.'' This case was followed in the Illinois Central Railroad Company v. Illinois Commerce Commission, 299 Ill. 67, 77 N. E. 2d 180.

Indeed this Court has strongly intimated at least that the requirement to establish and maintain a depot does not necessarily require a live agent on duty within reasonable hours at all times. Section 7847, Mississippi Code of 1942, provides: ''And every railroad shall establish and maintain a depot within the corporate limits of every incorporated city, town or village through which that railroad passes * * *.'' In the case of Citizens of Stringer v. G. M. and O. Railroad, 90 So. 2d 25, (Miss.) this Court said: ''We have no statute which imposes upon a railroad company the absolute duty to maintain an agency station.''

The proof in this case shows that appellee railway has in its system some 600 to 700 non-agency, or prepay

stations. The law must be applied to conditions as they change. We cannot turn back the clock nor prevent the changing conditions.

In Stepp v. State, 202 Miss. 725, 32 So. 2d 447, this Court said: "A constitution is intended to endure for a long time, and is interpreted in the light of developments which have appeared at the time of the interpretation." Chief Justice John Marshall, in McCulloch v. State of Maryland, 4 L. Ed. 579, made the observation that a constitution is "intended to endure for ages to come, and, consequently, to be adapted to the various crisis of human affairs."

Again it is said in 11 Am. Jur., Constitutional Law, Sec. 62, "Constitutions are to be construed in the light of their purpose and should be given a practical interpretation so that the mainly manifest purpose of those who created them may be carried out."

The trial judge, after noting the fact that no passenger service was needed at Sumner, made this pertinent observation: "It is apparent to all that the original purpose of the constitutional section was to provide methods of getting to court, which in the early days of the life of the state was a matter of great concern. The entire entourage of the court had to get from county site to county site, and there was no other method of doing so. Certainly some elasticity in interpretation should be allowed to meet the changing conditions in the economic world of today as well as changes in the transportation requirements which palpably made the provision applicable." With a fulltime agent the station would be operated at a financial loss. It is apparent that a large part of the time of such an agent would be consumed in twiddling his thumbs.

In Albritton v. Winona, 181 Miss. 75, 178 So. 799, it is said: "Growth is the life of the law, and when it ceases to grow and to keep pace with social and eco-

nomic needs it becomes a hindrance instead of an aid to the public welfare.''

We judicially know there are ninety one county sites in Mississippi. It is common knowledge that some of them don't have over two or three dozen people residing therein, yet, if a railroad runs through such community, it must maintain a fulltime agent therein regardless of need or cost. I don't think Sec. 187 of the constitution means that.

*Holmes* and *Gillespie, JJ.,* join in this dissent.